UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| SARAH WELLS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 19-500-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| GEICO GENERAL INSURANCE CO., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of two motions filed by Defendant GEICO General Insurance Company ("GEICO"). The first motion requests exclusion of an expert witness. The second seeks summary judgment. [Record Nos. 48, 49] When an insured driver in Kentucky claims a covered loss, it is unlawful for the driver's insurer to handle (i.e., settle) the claim in bad faith. *See* Kentucky Unfair Claims Settlement Practices Act ("UCSPA"), Ky. Rev. Stat. § 304.12-230. The same duty of good faith applies when an insurer handles claims by a third-party against its insured. *See Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993).

Plaintiff Sarah Wells was involved in a car accident with a driver insured by GEICO, prompting her to bring a personal injury claim against the driver. GEICO initially offered $800 to settle the claim. More than two years later, the claim settled for $300,000. Wells then brought the present action under the UCSPA, alleging that GEICO's settlement practices are unfair *per se* and that the resulting delay in settling her claim proves it. She retained an expert, Gary Fye, to testify about the unfairness of GEICO's practices. Wells maintains that GEICO

elevated its policies over the merits of her claim, despite knowing her claim was worth more all along.

The touchstone of a USCPA claim is that an insurer failed to pay a claim *in bad faith*. *See Wittmer*, 864 S.W.2d at 890.  To prove bad faith, a plaintiff must show, at a minimum, that the insurer was aware it had no reasonable basis for denying the claim.  *See United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (A claimant must show an insurer was "indifferen[t] to its insureds' rights.").  She must demonstrate wholly unreasonable, "egregious behavior." *Id.*  Rarely does the passage of time alone evidence bad faith.  *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452-53 (Ky. 1997).  Instead, Wells must show "that the *purpose* of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Id.* (emphasis added).

Wells has not demonstrated here that GEICO's conduct was so reprehensible.  Her expert provides few opinions that he is qualified to present, and none that meet the requirements of Rule 702 of the Federal Rules of Evidence.  But even if he had, there are no facts from which a jury could find that GEICO intentionally prolonged settling Wells' claim without a reasonable basis.  As a result, its motions will be granted.

## I.    FACTUAL BACKGROUND

Wilson Downing Road is a two-lane road that runs predominantly east -- west through Lexington, Kentucky.  The posted speed limit is 35 miles-per-hour.  [Record No. 48-2, p. 1] Because only one lane travels in each direction, cars intending to turn left off of Wilson Downing Road must wait for oncoming traffic to clear, which can cause traffic to back up behind the left-turning vehicle.  This commonplace inconvenience led to the accident

underlying this dispute.  [*See* Record No. 48-2.]  For clarity, the following factual summary is divided into sections that correspond to the years in which the events occurred.

### A.    2017: The Accident and Initial Attempts to Settle

Around 10:00 p.m. on January 6, 2017, Wells was riding in the front passenger seat of a Nissan Altima driven by Tatum Lewis.  [Record Nos. 48-2, p. 4; 48-5, p. 2]  The pair came to rest in the east-bound lane behind Andrea Burton, who was waiting in her Buick Century for west-bound traffic to clear so she could turn left onto Creel Court.  [Record Nos. 48-2, p. 2; 48-5, p. 3]  Elina Shvets was also traveling eastward toward the intersection of Wilson Downing Road and Creel Court in her Lexus LS430.  [Record Nos. 48-2, p. 2]  But Shvets was negligently preoccupied with the proper position of her seat.  It was too late to avoid a collision by the time she saw the cars stopped in front of her.  [*Id.*]  Shvets crashed into the back of the Altima, propelling Lewis and Wells toward the Century.  While Lewis attempted to steer the momentum-driven Altima out of the roadway, he was unable to avoid a collision with the Century.  [Record Nos. 48-2, p. 2; 48-5, p. 3]

A call was placed to 911 after the vehicles came to rest.  Lexington Police Officer Trippe responded to the scene.  [Record No. 48-2]  Not surprisingly, his report attributed the cause of the accident to human factors—specifically, Shvets' inattention and distraction.  [*Id.* at p. 3]  Only Shvets' Lexus was damaged to the extent that it required a tow from the scene.  Still, it was only "minor[ly] to moderate[ly]" damaged.  [*Id.* at p. 3]  The Altima's damages were reported as minor, and the Century's damages were "very minor."  [*Id.* at pp. 4-5]  In fact, Burton reported that although she heard the collision between Shvets and Lewis, she was initially unaware that her Century had been struck at all.  [*Id.* at p. 2]  Fortunately, none of the occupants required medical treatment at the scene.  [*Id.* at p. 1]

- 3 -

Approximately 30 minutes after the accident, Wells visited the Emergency Department at Baptist Health Lexington. [Record No. 48-4] She allegedly had suffered "initially . . . mild neck pain," but it had "steadily worsened." [*Id.* at p. 1] No "other pains, numbness, weakness or other acute complaints" were reported. [*Id.*] The treating physician diagnosed her with an acute cervical strain related to a motor vehicle collision and sent her home. [*Id.* at p. 3]

GEICO (Shvets' insurer) became aware of Wells' injuries a few days after the accident. [*See* Record No. 52-2, p. 118.] In an interview on January 12, 2017, Wells shed additional light on the severity of the accident. [Record Nos. 48-5; 52-2, pp. 109-11] On the one hand, she considered it a "pretty darn hard" collision because it caused her head to "snap" forward. [Record No. 48-5, p. 3] And she felt "awful" and "very, very sore." [*Id.* at pp. 3, 5] But on the other hand, she was secured by a seatbelt during the collision, the Altima's airbags did not deploy, and she and Lewis were able to "immediately g[et] out, [and] just tr[y] to make sure that everybody was okay." [*Id.* at pp. 3-4]

Wells also provided information concerning her medical treatment. She explained that she had gone to the hospital at the urging of Officer Trippe, to whom she had reported a headache after the accident. [Record No. 48-5, p. 5; *see also* Record No. 52-2, p. 114.] Wells advised the interviewer that she was suffering from headaches and migraines, which she believed to be symptoms of whiplash. [*Id.* at pp. 4, 5] She was planning to "give it a couple [of] days" to see if her symptoms—"just [] normal, what you get from a car accident"—subsided. [*Id.* at p. 5] Wells provided that she had suffered similar injuries in a previous car accident. [*Id.* at p. 6]

At the end of the interview, GEICO offered Wells $800.00 to settle her personal injury claim against Shvets. [Record Nos. 48-6, p. 2; 52-2, pp. 108-09] GEICO was also willing to

- 4 -

admit that Shvets was at fault.  [*Id.*]  Wells did not immediately accept or reject the offer, and Tiffany Butler, the employee handling Wells' claim at the time, attempted to follow-up about a week later.  [*Id.* at p. 102]

Wells rejected the offer in a phone call with Butler on January 23, 2017.  [Record No. 52-2, p. 100]  Her neck pain was not going away and she wanted to give it some more time. She reported that she was seeing a chiropractor daily just to function, and it was interfering with her ability to work and attend school.  [*Id.*]  Wells' chiropractor believed an additional month or two of treatment would help, and she was unwilling to accept a settlement until then. [*Id.*]

Contemporaneous medical records indicate that Wells' neck pain continued.  Within a week of rejecting GEICO's offer, Wells was back at the hospital "due to severe and worsened neck pain, back pain, and headaches associated with dizziness, nausea, and vomiting." [Record No. 48-7, pp. 1, 3-5]  She was treated and discharged with instructions to follow-up if her symptoms persisted.  [*Id.*]

GEICO would not become aware of the second hospital visit (or any of Wells' continuing treatment, for that matter) until months later.  Wells retained counsel on February 2, 2017, and the flow of information between the parties slowed to a trickle.  [Record No. 52-2, p. 98]  Between February and May, GEICO made four unsuccessful attempts to reach counsel for an update on Wells' condition.  [*Id.* at p. 93 (February 23 phone call), p. 92 (March 20 phone call), p. 91 (April 13 phone call), p. 88 (May 8 phone call)]  Finally, on May 9, 2017, counsel informed GEICO that not much had changed.  [*Id.* at pp. 87-88]  Wells was still in pain, and she claimed that it was still impacting her daily life.  Most impacted was her ability

to study for school, allegedly causing her grades to suffer.  [*Id.*]  GEICO asked counsel for

Wells' medical records, but he advised that they were still being collected.  [*Id.*]

After this brief report, another four months passed before GEICO reached Wells again.

[*See* Record No. 52-2, p. 87 (June 6 phone call), p. 86 (July 5, July 23, and August 21 phone

calls).]  On September 6, 2017, Wells' counsel left a voicemail for Butler, stating that Wells

had been diagnosed with head injuries—specifically, memory loss—by a neurologist.  [*Id.* a

p. 86]  He advised that a demand letter for the full limits of Shvets' policy, accompanied by

Wells' medical records, was forthcoming.  [*Id.*]

Wells' claim was then transferred to Steven Blalock,[1] and he spoke with Wells' counsel

a couple of days later.  [Record No. 52-2, p. 84]  In support of the anticipated demand, counsel

reported that Wells was experiencing "massive headaches," leading a neurologist to schedule

a "memory test."  [*Id.*]  Her physical symptoms were improving with physical therapy, which

she had begun after she stopped seeing the chiropractor.  [*Id.*]  Counsel advised that he would

follow-up as more information became available.  [*Id.*]  Based on this report, GEICO increased

the reserve on Wells' claim to $100,002.00, which corresponded to the limits on Shvets'

policy.  [*Id.* at p. 83]

Two-and-a-half months later, Wells made her first demand for the full policy limits.

[Record No. 52-2, p. 79; *see also* Record No. 48-14, p. 2.]  GEICO received the letter on

December 1, 2017.  [*Id.*]  It summarized Wells' medical treatment related to the accident,

including the emergency-room visits, unsuccessful chiropractic treatment, and physical

---

[1]     As discussed below, Wells characterized this move as a product of GEICO's internal practice of transferring claims to a department that handles "higher value claims."  [Record No. 52, p. 3]

therapy sessions.  [Record No. 48-7, pp. 3-5, 6-7]  An orthopedist had ordered physical-therapy treatment after diagnosing Wells with a cervical strain and cervicalgia; she also underwent an MRI that appeared to confirm the diagnosis.  [*Id.* at p. 6]  Treatment notes also indicated that, in early February, Wells' neck pain was so severe that she was forced to "physically hold[] her head up with one arm."  [*Id.* at p. 6]

Neurological treatment records also accompanied the first demand letter.  Dr. Padmaja Sudhakar with the University of Kentucky Neuroscience Institute had evaluated Wells on two occasions.  [Record Nos. 48-8, 48-9]  The first consultation, which occurred on July 19, 2017, led Sudhakar to characterize Wells' symptoms as "po[st] traumatic stress headaches" related to the accident.  [Record No. 48-8, p. 4]  Sudhakar noted "concern[s] for [a] possible traumatic brain injury ["TBI"]" but indicated that he "would like to obtain [an] MRI . . . for further evaluation."  [*Id.*]  During the consultation, Wells reported that she believed she had "already done MRIs—she w[ould] bring her prior images for review" at the next appointment.  [*Id.*]  Sudhakar further commented that he would "like to do a neuropsychological assessment since there was [TBI]."  [*Id.*]

Wells returned for a second consultation on October 25, 2017.  [Record No. 48-9]  She reported that she had stopped taking the medication Sudhakar prescribed for her headaches within a week of the prior appointment due to its side effects.  [*Id.* at p. 1]  Nevertheless, her headaches were "better but not gone."  [*Id.*]  She was still awaiting a neuropsychological evaluation, and she had not been able to locate any images from a prior MRI.  [*Id.*]  Sudhakar adjusted Wells' medication, scheduled her to receive a nerve block injection in her neck, and ordered MRIs of her head and neck.  [*Id.* at p. 4]

Based on these medical encounters, the first demand letter calculated Wells' total damages as $31,250.22. [Record No. 48-7, p. 11] It stated that Wells had been "diagnosed . . . with a mild TBI." [*Id.* at p. 2] A few days after GEICO received the letter, counsel reported to Blalock that several of Wells' friends had witnessed her memory issues. [Record No. 52-2, p. 78-79] And he advised that she was receiving nerve block injections to treat her symptoms, which would continue to increase her medical bills. [*Id.*] Soon after, Blalock received authority from GEICO to pay up to $75,000.00 to settle the claim. [Record No. 52-2, p. 77] On December 6, 2017, Blalock offered to settle the claim for $60,000.00. [*Id.* at p. 76] In response to the offer, Wells' counsel advised that he was under the impression that GEICO's limits on Shvets' policy were only $50,000.00. Nevertheless, he needed to consult with Wells to decide whether to accept the offer. [*Id.*]

On December 18, 2017, GEICO received a reiterated demand for the policy limits.[2] [Record No. 52-2, p. 75; *see also* Record No. 48-14, p. 2.] GEICO responded by requesting Wells' medical records and an independent medical evaluation ("IME"). [*Id.*; Record No. 48-1, p. 8] Wells' counsel was apparently surprised by the request, and he advised that Wells would file suit before submitting to an IME. [*Id.*]

**B.    2018: Wells Files Suit**

GEICO began developing a defense to potential suit in early 2018. Counsel had identified two issues that militated against increasing GEICO's offer: there was a "gap in treatment [records] from july [sic] to October," and no MRI had "fully diagnose[d]" the TBI Wells claimed to be suffering. [Record No. 52-2, pp. 68-69] Despite the "objective" findings

---

[2]    GEICO retained defense counsel on December 18, 2017. [*See* Record No. 52-2, p. 75.]

of a TBI, counsel did not yet have any "additional records of [an] MRI . . . or neuropsych[iatric] appointment to fully diagnosis [sic] a [TBI]." [*Id.*] At this point, counsel advised GEICO to stick to its offer for the time being. [*Id.* at p. 69]

Wells filed suit almost one year to the day after the underlying accident: on January 8, 2018. [Record No. 52-2, p. 67; 48-6, ¶ 13; 48-14, p. 2] Little progress was made toward a settlement as the parties proceeded through the pleading stages of litigation,. GEICO "gave authority to have [a] neurologist review the file" in March, but the review would not occur until the file was completed over a year later. [Record Nos. 52-2, p. 55; *see also* Record No. 48-11 (report of Dr. Shannon Voor dated April 5, 2019).]

Discovery yielded additional information through the Spring of 2018, but none of it altered counsel's advice. In April, counsel reported that medical records supported its suspicions about the gap in Wells' treatment. Although her neck pain was all but resolved by physical therapy, nearly seven weeks passed before she was treated for headaches. [Record No. 52-2, pp. 48-49 (noting she was discharged from physical therapy with "pain at 1" and "[b]ack to her normal life")] And Wells' appointment with a neuropsychiatrist was scheduled for early May. [*Id.* at p. 50-51] At this point, counsel advised GEICO that it should await an MRI before determining whether the settlement offer (still at $60,000.00) should be increased.[3] [*Id.* at p. 51]

---

[3]     Wells made a renewed demand for the policy limits on April 4, 2018. [Record No. 52-4, pp. 1-3] It reported that Wells' medical bills were approaching $40,000.00, and that she had recently undergone "six injections in the back of her head and will continue to do so for the foreseeable future." [*Id.* at p. 1] There is no indication that GEICO was made specifically aware of this demand letter, but its substance was largely reported in counsel's updates and subsequent demand letters.

In May 2018, counsel reported more information that had the potential to undercut the severity of Wells' injuries. For example, Wells' academic records "bolstered" GEICO's defense because her grades had, in fact, improved following the accident. [Record No. 52-2, p. 45] Additionally, discovery yielded a "long and complicated medical history" including "many years" of treatment for headaches and back pain beginning at the age of 16. [*Id.* at p. 42] It also included a 2009 car accident, after which Wells reported similar symptoms (headaches, numbness, and shooting pains in her right arm). [*Id.* at p. 40] Counsel advised that this medical history was incomplete—there was "a large gap in record[ed]" treatment from 2011 to the date of the accident—but forthcoming records were likely to fill the gap. [*Id.* at p. 41] Despite these positive developments, Wells was continuing to demand the limits on Shvets' policy, and counsel advised GEICO to be "prepared to litigate th[e] matter." [*Id.*]

By June 18, 2018, counsel had received and reviewed the neuropsychological report. [Record No. 52-2, p. 38] He reported to GEICO that he had developed doubts about the methodology and conclusions. [*Id.*] Specifically, counsel expressed concerns that the testing was "inadequate" because it "lasted [two] hours." [*Id.*]

GEICO reevaluated the status of the claim at the end of July. It noted that Wells was claiming "increased migraines, a [TBI] and back pain" as a result of the accident, but "discovery ha[d] turned up long standing [sic] migraine and back issues." [Record No. 52-2, p. 34] It intended to use Wells' deposition as an opportunity to "clarif[y]" this history and its impact on Wells' current injuries. [*Id.*] GEICO had still not received a copy of the neuropsychological report, which it "need[ed]" prior to conducting Wells' deposition or scheduling an evaluation by its own retained physician. [*Id.*]

Wells again demanded the policy limits on July 27, 2018, but GEICO did not receive the second demand until three days before it was set to expire.  [*See* Record No. 52-2, pp. 32-33; *see also* Record Nos. 52-4, pp. 5-9; 48-14, p. 2.]  The demand reported a "significant increase" in medical damages and continuing treatment.  [Record No. 48-14, p. 2]  It also relied on the "confirmation of the TBI diagnosis" by a neuropsychologist, "which directly correlate[d] to the findings of the neurologist."  [Record No. 52-4, pp. 5, 7]  Wells' medical bills were also likely "over $40,000" at this point, and she claimed that her "soft tissue injuries alone would warrant a policy limits offer in this case."  [*Id.* at p. 5]

GEICO received a copy of the neurocognitive assessment performed by Dr. Dong Han on May 7, 2018, before it responded to the second demand.  [Record No. 48-13]  Han made the following conclusions: Wells' intellectual functioning was "consistent with [her] estimated premorbid [pre-accident] baseline."  Although she suffered from "impaired verbal memory in list format," her "prose format verbal memory" remained intact.  Wells' "executive skills, processing speed, and expressive verbal fluency" were impaired, some severely.  She also had "bilateral motor deficits," including severe limitations in grip strength.  And Wells manifested "elevated anxiety and depression" levels.  [*Id.* at pp. 3-7]  In all, Han concluded that Wells suffered from a "neurocognitive disorder, secondary to [a] head injury" that was "postconcussive" and "chronic."  [*Id.* at p. 3]  He recommended treatment for each of the noted defects, but opined that her current status was "potentially a new baseline."  [*Id.*]

GEICO responded to the second demand by reiterating its offer for $60,000.00 to settle the claim.  [Record No. 52-2, p. 32]  It instructed counsel to schedule Wells' deposition and an independent neuropsychological records review or IME.  [*Id.*]  Wells was deposed on

October 9, 2018.[4]  [*See* Record Nos. 48-6, ¶ 13; 52-2, p. 26.]  Counsel reported that it "went pretty well for [GEICO]."  [Record No. 52-2, p. 26]  Specifically, counsel advised that Wells had refuted a number of the medical records disclosed in the case and created several inconsistencies regarding her injuries.  [*Id.*]

Encouraged by Wells' deposition, counsel for GEICO saw an end in sight by November 2018.  There were two potential avenues for resolving Wells' suit in GEICO's favor: either get Wells to agree to drop the TBI diagnosis and proceed to private mediation with the soft-tissue damages claims alone; or, if that failed, seek an IME to confirm the TBI diagnosis before proceeding to trial.  [Record No. 52-2, p. 25]  GEICO "agreed," and counsel set about to gauge Wells' interest in narrowing her claims.  [*Id.*]

### C.   2019: The Parties Settle Wells' Claim

Wells had not agreed to drop the TBI diagnosis by January 2019.  [*Id.* at p. 22]  Her medical bills were continuing to mount, so counsel shifted to "discredit[ing]" the diagnosis.  [*Id.* at p. 22]  GEICO agreed to retain neuropsychologist Shannon Voor to provide an opinion on Wells' medical records.  [Record Nos. 48-6, ¶ 17; 52-2, p. 19]  Voor's April 5, 2019, report expressed several opinions regarding the consistency between Wells' reported symptoms and her diagnosis.  [Record No. 48-11]  However, without conducting an examination, Voor was unable to opine on whether Wells suffered a TBI as a result of the accident.  [*Id.* at p. 2]

---

[4]     Around the middle of August 2018, a lingering issue for GEICO had come to the fore. Wells wanted to depose Shvets, but GEICO had been unable to locate her for some time, as she had moved to California and stopped answering calls.  [*See* Record No. 52-2, p. 31 ("phone rings and rings with no answer"); p. 32.]  In fact, Wells' counsel noticed Shvets' deposition before GEICO was able to locate her.  [*Id.* at p. 30]  Fortunately, the parties were able to agree to a 45-day window within which GEICO would locate Shvets and schedule her deposition. [*Id.*]  But Shvets was not located until October 25, 2018, and it is unclear whether she was ever deposed.  [*See* Record No. 52-2, pp. 25-26.]

By May 20, 2019, Wells had accrued over $57,000 in medical bills and was receiving injections for migraines every six weeks. [Record No. 52-2, p. 14; Record No. 48-6, ¶ 18] GEICO had not discovered records that filled the large gap in Wells' migraine treatment, and it appeared that her migraines may have returned as a result of the accident. [*Id.*] Additionally, GEICO was unable to disprove the TBI diagnosis to its satisfaction. To make matters worse, Wells' physician was prepared to testify that she had suffered a TBI as a result of the accident. [Record No. 48-6, ¶ 18] Thus, GEICO authorized $100,000.00 to settle Wells' claim. [*Id.* at ¶ 20]

That same day, but prior to GEICO transmitting its $100,000.00 offer, Wells retracted her policy-limits demand and made a "time-limited demand for $300,000.00 in exchange for a full release of liability for Ms. Shvets for causing the crash." [Record No. 48-14, p. 1] The third demand letter stated that it would expire in 8 days, at which time it would increase to $500,000.00. [*Id.*] Two days later, GEICO acquiesced to Wells' demand. [Record No. 52-2, p. 12] The agreement was consummated in writing on July 17, 2019. [Record No. 48-15]

## II.   PROCEDURAL HISTORY

Wells filed the present action on November 9, 2019, in Fayette Circuit Court. [Record No. 1-1] The Complaint alleges that GEICO violated the UCSPA, K.R.S. § 304.12-230, by failing to adhere to several of the standards set out therein. [*Id.* at pp. 3-4] GEICO removed the action on December 26, 2019. [Record No. 1]

### A.   Fye's Expert Report

Wells disclosed one expert witness, Gary T. Fye, to testify about the "basic principles of insurance claims handling and settlement practices . . . in the insurance industry" and how GEICO "violated many of these standards" in settling Wells' claim. [Record No. 33, p. 1]

Fye identifies himself as "a national claim-handling expert or consultant in about forty states, including Kentucky." [Record No. 33-1, p. 1] He was once a claims-adjuster, but he began working as a "litigation consultant" in 1977 and retired from claims-adjusting to focus exclusively on consulting in 1998. [*Id.*; *see also* Record No. 33-1, p. 12 (Fye's *curriculum vitae*).] He provided an extensive list of cases in which he has participated, dating back to 2015 but nevertheless including proceedings in several states. [*Id.* at pp. 14-17]

Fye's 10-page report first describes his methodology, which primarily consists of reviewing the case records and comparing a defendant's claims-handling practices to "nationally recognized claim practices that are generally accepted by insurers." [Record No. 33-1, p. 3] Next, he outlines and explains his opinion that claims-handling practices are not "divorced from the economic realities of the competitive industry in which they occur," leading some insurers to "attempt to achieve improved economic outcomes by employing improper practices." [*Id.* at p. 4]

From the factual record underlying Wells' claim, Fye draws the following substantive "opinions and conclusions." [Record No. 33-1, p. 9 (typeface altered)] First, GEICO "underperform[ed]" its obligations to Wells because it "knew without dispute" that it was required to pay the full policy limits on the claim, and there was "no . . . reasonable basis to withhold payment of policy proceeds." [*Id.* at p. 9] To that end, GEICO embodied a strategy intended to "discredit, disparage, and undermine [Wells'] proof by suggesting that distant prior problems were responsible for her current complaints." [*Id.*]

Second, GEICO's "training protocols" instruct claim handlers to make "insultingly low" offers that are economically efficient but wrongful and "antithetical to Kentucky's UCSPA." [Record No. 33-1, p. 9] GEICO "shift[ed]" from fair claims handling practices to

a "culture" of unfair tactics, proving that it "intended to ignore its obligation to settle[ and] had no reasonable basis to undermine the permanent injury claim." [*Id.* at p. 10]  Fye also opines that, although GEICO ultimately paid a settlement in excess of the policy limits here, that "is not a sufficient disincentive to deter" it from employing similar practices—manifested by an "institutional disregard of the rights of claimants"—in the future.  [*Id.*]

## B.    GEICO's Motion to Exclude

GEICO contends that Fye is unqualified to testify as an expert in these proceedings and that, even if he were, his testimony would not assist the jury.  [Record No. 49-1]  Fye is allegedly unqualified because he "has not handled an insurance claim since 1999" and he is not sufficiently familiar with Kentucky law regarding claims-settlement practices.  [*Id.* at pp. 6-7] GEICO also argues that Fye's experience "has little relationship to the opinions" he offers concerning Wells' claim and the "profitability of delaying the payment of a claim" in general. [*Id.* at p. 7]

Relying on various statements Fye allegedly made in his deposition,[5] GEICO argues that his opinions are not based on any reliable methodology and, therefore, are unlikely to assist the jury.  [Record No. 49-1, pp. 7-8]  Rather than provide an opinion based on the facts of *this* case, Fye allegedly relied on "his own personal assumption that *every* insurer's conduct is 'reprehensible,' and *every* insurer tries to 'lowball' claimants, which is *always* an 'abuse' of processes."  [*Id.* at p. 9 (emphasis in original)]  GEICO provides several examples to illustrate

---

[5]     GEICO moved to exclude Fye before a transcript of his deposition had been finalized. [*See* Record No. 49-1, p. 1 n.1.]  Although a final transcript is not in the record of these proceedings, GEICO makes several representations about the nature of Fye's testimony. GEICO also attached "relevant portions" of the non-final deposition to its reply.  [Record No. 56-1]  Wells does not contest GEICO's characterization of Fye's testimony.

the point, including the following two: despite opining that GEICO "knew this was a policy limits case," Fye could not identify when GEICO became aware of that fact; and, despite his belief that Wells' claim-handlers were improperly trained to "lowball" her claim, Fye stated that he "d[id] not know when the claims examiners who handled [Wells'] claims were trained or what the [training] manuals looked like at the time." [*Id.* at pp. 7-8]

Wells' response contends that Fye's 59 years "of experience in the insurance industry" makes him qualified to testify in this matter, as he has done "in various state and federal courts over the years." [Record No. 51, p. 2] And, regarding whether his opinions will assist the jury, Wells argues that "Fye's opinions have a sufficient foundation" based on his review of the record in this matter. [*Id.* at p. 3] In support of the latter point, Wells merely reproduces, word-for-word, three pages of Fye's report. [*Id.* at pp. 3-7]

### C.    GEICO's Motion for Summary Judgment

GEICO dubs Wells' claims "transparently meritless." [Record No. 48-1, p. 2] It contends that ample evidence supports its legitimate inquiry into the severity of Wells' injuries, precluding her from showing that it lacked any reasonable basis for denying the claim. [*Id.* at pp. 16-20] In its opinion, "[t]he record reflects nothing more than that GEICO promptly and diligently investigated [Wells'] medical history, re-evaluated [her] claim in light of the facts and information discovered, and thereupon offered the policy limits." [*Id.* at p. 18] For similar reasons, GEICO contends that Wells is unable to show that it "'knew' there was no basis for initially declining [her] policy-limit demand or [that it] acted with reckless disregard for whether such a basis existed." [*Id.* at p. 21] And even accepting Wells' characterization of the settlement as "delayed," GEICO asserts that she is unable to show that its investigation

was a mere "subterfuge to 'extort a more favorable settlement' or 'deceive [Wells] with respect to the applicable coverage.'" [*Id.* (quoting *Motorists Mut.*, 996 S.W.2d at 452-53)]

Wells' response argues that the factual record supports "inferences [that] warrant denial of [GEICO's] motion because [Wells] has presented proof that [GEICO] acted unreasonably in the time it took to process her claim." [Record No. 52, p. 10] She points to several considerations that could support an inference of bad faith: GEICO offered to settle for less than "the reserve on her file [and] the actual authority that was granted"; the claim was settled "[f]or [five times] the current offer with no new information being presented"; and her settlement was "extensive[ly] delay[ed]." [*Id.* at p. 11]

Wells offers GEICO "training material" that has "surfaced" in "other cases" involving GEICO to prove that the delay here was a mere "tactic". [Record No. 52, p. 2 (referring to Record No. 52-1)] The attached materials were apparently contained in an appendix to the training materials provided to new GEICO employees. [*See* Record No. 55-2, p. 9.] These "Homework reading assignment[s]" concerned negotiating—specifically, the author intended to "identify some key elements in what keeps negotiating from becoming stale or predictable" in an effort to "excite" and "enthuse" the reader "to come to work every day and to negotiate" with claimants. [Record No. 52-1, p. 1]

Wells highlights negotiating tactics contained in the materials that are wholly disconnected from the merits of a claimant's position. [Record No. 52, p. 2] As a few examples, the article advises claims managers to: never pay a claimant's initial asking price; never assume an offer is "insultingly low" until told so by a claimant; and try to "increase[e] the distance between the other side and [the insurer]" by making an initial offer much lower than the insurer would be willing to pay. [Record No. 52-1, pp. 8, 17] Wells contends that

these materials give rise to the reasonable inference that her settlement was intentionally postponed.

Additionally, Wells contends that GEICO claims-handlers have another motive to settle claims for as little money as possible: GEICO shares profits with its employees. [Record No. 52, pp. 9-10]  In her opinion, "the fact that a plan to pay extra money tied to company profit *possibly* influenced the claims staff makes any expert testimony regarding the impropriety of those plans relevant and something to be considered by the jury." [*Id.* at p. 10 (emphasis altered from original)]

In its reply, GEICO asserts that the training materials embody "a small portion of a 2009 GEICO training manual" that was introduced in another proceeding against it. [Record No. 55, pp. 7-8]  It argues that the materials have "absolutely no bearing on this case," because they were "removed from the GEICO training materials years before" Wells' accident. [*Id.* at p. 8]  But even if it were still provided to trainees, it "does not establish that GEICO knew that it lacked a reasonable basis" for denying Wells' claim. [*Id.* at p. 9]  Similarly, GEICO disputes that its profit-sharing plan has anything to do with Wells' claim. [*Id.* at pp. 9-10]  It argues that the fact of profit-sharing alone is insufficient  to create an genuine issue of fact precluding summary judgment. [*Id.*]

### III.   LEGAL STANDARDS OF REVIEW

Rule 702 of the Federal Rules of Evidence "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).[6]  It states:

---

[6]     *Daubert* applied a prior version of Rule 702, but the current version was adopted "in response to [it]".  Advisory Committee Notes to the 2000 Amendments to Fed. R. Evid. 702.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Sixth Circuit has reasoned that testimony satisfies Rule 702 when (1) a qualified expert provides opinions that (2) will assist the jury in understanding the evidence or determining a fact in issue, and (3) the opinions are based on reliable methods.  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).

The proponent of expert testimony bears the burden of establishing its admissibility. *United States v. Weinland*, 2012 WL 1947334, at *1 (E.D. Ky. May 30, 2012) (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001)).  "[A] proffering party can qualify their expert with reference to his 'knowledge, skill, experience, training or education.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir. 2007) (quoting Fed. R. Evid. 702).  Experience alone may qualify a witness as an expert.  *United States v. Cunningham*, 679 F.3d 355, 378 (6th Cir. 2012) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)).  But where a party rests a witness's qualification on experience alone, a court should probe the "nature and extent of that experience" to determine whether it is "sufficient to qualify the expert to offer an opinion on a particular subject." *Id.* at 379; *see also Surles*, 474 F.3d at 294 (A court should determine whether an expert's "background and experience leaves him well-positioned to 'assist the trier of fact' to make sense of the" record).

If an expert is qualified, a court must determine whether expert testimony is relevant and reliable.  Rule 702 enlists courts "in the role of 'gatekeeper'" and instructs them to evaluate the relevance and reliability of evidence with "heightened care."  *Surles*, 474 F.3d at 295.  Although the Supreme Court has "mentioned" a number of factors for a court to consider when evaluating reliability, "a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Kumho Tire*, 526 U.S. at 142 (emphasis in original).  This discretion reflects the fact that relevance and reliability inquiries are "context-specific and 'must be tied to the facts of a particular case.'"  *Surles*, 474 F.3d at 295 (quoting *Kumho Tire*, 526 U.S. at 150).

When faced with a motion for summary judgment, a court generally views all facts and inferences drawn from the evidence "in the light most favorable to the nonmoving party." *Black v. Pension Ben. Guar. Corp.*, 983 F.3d 858, 862 (6th Cir. 2020) (citing *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019)).  And parties are permitted to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Thus, a court considers only that evidence that remains after the evidentiary issues are sorted out.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  The operative inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The moving party bears the initial burden to produce evidence that it is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 317. This burden is met simply by showing that there is an absence of evidence on an issue which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325.

Once the moving party has met its burden of production, the burden shifts to the nonmoving party to come forward with "specific facts" that indicate there is a "genuine issue" for trial. *Celotex Corp.*, 477 U.S. at 324; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). This burden requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmovant must "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994) (citation omitted).

"The judge's function is not to weigh the evidence, but to decide whether there are genuine issues for trial." *Moses v. Baker*, 798 F. Supp. 2d 863, 865 (E.D. Ky. 2011) (citing *Anderson*, 477 U.S. at 249). If the burden shifts to the nonmovant, summary judgment is precluded only if a dispute exists over a fact that "might affect the outcome of the suit," not over facts that are "irrelevant or unnecessary." *Anderson*, 477 U.S. at 248. And an issue is "genuine" where the trier of fact could rationally resolve the issue in the nonmovant's favor. *Matsushita Elec.*, 475 U.S. at 586-87.

## IV.   LEGAL ANALYSIS

At the outset, the Court notes that Shvets' liability to Wells is not at issue in this matter. Neither party suggests that Wells was not fully compensated for her injuries. Rather, the Court is asked to review the process leading to the parties' settlement and determine whether a

reasonable jury could conclude that GEICO acted in bad faith.  On this point, Wells'

"evidentiary threshold is high indeed": she must "demonstrate that [GEICO] has engaged in

outrageous conduct toward [her]."  *Bult*, 183 S.W.3d at 186.  It is not enough to point out the

"potential for mischief," it "must be shown to have ripened into the reality of tortious conduct."

*Id.* at 188.  In other words, although factual inferences are to be drawn in Wells' favor, the

inference itself must leave no doubt that GEICO "was motivated by evil design or reckless

disregard for [Wells'] rights."  *Id.*

      With these considerations in mind, the Court will first determine whether Fye's

anticipated testimony is admissible.  After resolving the evidentiary issue, the Court will

consider whether Wells can show GEICO acted in bad faith.

> **A.    Although Wells' expert witness is qualified to testify regarding some of the matters in his report, his opinions are unreliable and would not assist the jury.**

> **1.    Fye is qualified, in part.**

      Fye is undoubtedly qualified to testify as an expert on general claims-handling

practices.  As the undersigned has reasoned, "Rule 702 *only requires* expertise acquired by

'knowledge, skill, experience, training or education.'"  *United States v. Lawson*, 2009 WL

1208014, at *5 (E.D. Ky. May 1, 2009) (emphasis added).  Wells intends to demonstrate Fye's

qualifications through his experience.  [Record No. 51, p. 2 (referring to the "simple fact that

he was [an insurance adjuster] for decades")]  And she has a point: Fye has nearly 60 years of

experience in claims handling, he took continuing education courses for nearly 35 years, and

he continues to frequently give presentations on the topic.  [*See* Record No. 33-1, pp. 12, 29-

31, 33-40.]  Thus, he is qualified to provide expert testimony regarding general best practices

in claims handling.

However, GEICO challenges Fye's qualifications to offer two of his more specific opinions. First, it contends that Fye's Kentucky-specific training and education do not render him qualified to provide an opinion on GEICO's practices in this matter. [Record No. 49-1, p. 7] But while GEICO is correct that Fye does not appear to have ever actually settled a claim in Kentucky, the undersigned is unaware of any rule requiring an expert to have experience in the relevant jurisdiction. In fact, it is Fye's opinion that "claim-handling standards have only slight variation from state to state." [Record No. 33-1, p. 5] Regardless of the merits of that position (which GEICO has not challenged), Fye's experience renders him qualified to offer it.

Second, GEICO challenges Fye's qualifications to opine on the profitability of delaying payment of an insurance claim. [Record No. 49-1, p. 7] The Court finds this concern to be well-taken. For example, Fye's report discusses multiple economic factors that allegedly influence insurance companies' decision-making, but he does not claim to have any relevant background in financial analysis. [*See, e.g.*, Record No. 33-1, p. 4 ("Claims analysts examine the principles of insurance accounting and reporting to understand the influence of economic conditions on claim-handling behaviors.").] More problematically, Fye has no experience as a decision-maker within an insurance company. He intends to testify that policies resulting in delayed settlements must have been motivated by profitability concerns alone, but he has no experience balancing competing motivations. In other words, there is no indication that his experience "leaves him well-positioned to 'assist the trier of fact'" in understanding the economic forces that drive corporate decisions within insurance companies. *Surles*, 474 F.3d at 294. Thus, Fye is not qualified to provide expert testimony regarding the economic motivations for GEICO's claims-handling policies.

- 23 -

### 2. Fye's opinions fail the remaining requirements of Rule 702.

Some of the opinions Fye is qualified to present are unreliable because they are supported by evidence that has no bearing on Wells' claim. Rule 702 requires opinions to be based on reliable methods that are reasonably applied to the facts of the case. Fed. R. Evid. 702(c)-(d). Fye places a significant amount of weight on the GEICO training materials summarized above. [Record No. 33-1, p. 9 (quoting from the materials)] He opines that these materials demonstrate a culture of "unfair tactics" that existed prior to Wells' injury and continued through the settlement of her claim. [*Id.* at pp. 9-10] From this, he intends to tell the jury that GEICO employees are trained to engage in a "wrongful manner of handling claims" that is "antithetical to Kentucky's UCSPA." [*Id.*] But GEICO has demonstrated that this opinion is unreliable because it stopped providing the training materials to employees "years before" Wells' claim. [Record No. 55, p. 8 (citing Record No. 55-1, p. 89)] Even if Fye's conclusions were properly drawn from the record, he was seemingly misled to believe that GEICO continues to suggest that its employees read the materials. Because that is no longer the case, Fye's opinion that GEICO employees are trained to "subvert" the USCPA is unreliable. [Record No. 33-1, p. 10]

The remainder of Fye's opinions are more likely to confuse the jury than they are likely to assist it. His report is loaded with allegations regarding GEICO's handling of Wells' claim, but it is light on references to the factual record in this case. For example, Fye repeatedly emphasizes that an insurance company's goal is to "delay" claims, but he does not provide a metric for differentiating between prompt and delayed settlements. Presumably, he intends for a jury to find that payment was delayed because it was not promptly made after GEICO became aware of its obligation to pay the claim, but Fye does not identify *when* GEICO "knew without

dispute" that it was "obligated to pay its limits for the injuries." [Record No. 33-1, p. 9] And he relies on the fact that GEICO has a profit-sharing agreement with its employees, but he fails to explain how a claims-handler could have profited off of Wells' claim. Wells seems to acknowledge that this opinion is unhelpful, and she seeks to show its relevance based on the mere possibility that it "influenced the claims staff" handling GEICO's claim. [Record No. 52, p. 10] Rule 702 requires more than a mere possibility to form the basis of an opinion. In short, Fye's conclusory allegations "have little probative value." *Madison v. Nationwide Mut. Ins. Co.*, No. 1:11-cv-157-TBR, 2013 WL 3992410, at *9 (W.D. Ky. Aug. 2, 2013) (excluding Fye's opinions in a similar proceeding).

Where Fye does discuss what actually happened in this case, he views the record only in the light most favorable to his opinions. In his view, GEICO "sought investigative data *to* resist payment," and its concern about her prior medical history was nothing more than a "self-serving commentary." [*Id.* at p. 9 (emphasis added)] Most telling is the following observation: in discussing GEICO's training materials, Fye acknowledges that "GEICO has adopted wider claim training in internal publications," but he contends that "*this claim* illustrates that it has implemented wrongful techniques into its claim culture that promote undermining injury claims and delaying their resolution." [*Id.* at p. 10 (emphasis added)] In other words, Fye intends to testify that whatever policies GEICO actually has in place, the jury can take his word for it that "covert" policies are actually causing damages to claimants like Wells. [*Id.*] These opinions are not likely to assist the jury in understanding anything but Wells' theory of the case. Thus, GEICO's motion to exclude Fye will be granted.

**B.     Wells has failed to demonstrate that a jury could find that GEICO handled her claim in bad faith, and GEICO is entitled to summary judgment.**

The USCPA "imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured or to another person bringing a claim under an insurance policy." *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006).   It "fundamentally requires that 'a good faith attempt be made to effectuate a prompt, fair and equitable settlement.'" *Phelps v. State Farm Mut. Auto. Ins. Co.*, 736 F.3d 697, 703 (6th Cir. 2012) (quoting *Motorists Mut.*, 996 S.W.2d at 454).  Insurers are not subject to "an amorphous, non-specific duty"; rather, the USCPA prohibits 14 specific unfair practices.  *Knotts*, 197 S.W.3d at 515; K.R.S § 304.12-230.

Wells alleges that GEICO violated the following subsections:

It is an unfair claims settlement practice for any person to commit or perform any of the following acts or omissions:

. . .

(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

. . .

(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; [and]

(7) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds[.]

K.R.S. § 304.12-230(3)-(4), (6)-(7).

- 26 -

But a court's inquiry does not end with the statutory provisions. "A bad faith claim under Kentucky law is, essentially, a punitive action." *Hollaway v. Direct Gen. Ins. Co. of Mississippi, Inc.*, 497 S.W.3d 733, 739 (Ky. 2016). To that end, it is not enough to show that an insurer merely failed to comply with a statutory duty. *See Wittmer*, 864 S.W.2d at 890 ("[T]here is no such thing as a 'technical violation' of the UCSPA."). Rather, "there must be evidence sufficient to warrant punitive damages" for a bad faith claim to reach a jury. *Id.*; *see also Mosley v. Arch Specialty Ins. Co.*, No. 2018-SC-0586-DG, 2021 WL 2618196, at *6 (Ky. June 17, 2021) ("The alleged conduct must go beyond negligence and justify the imposition of punitive damages."). This is "a high threshold standard that requires evidence of 'intentional misconduct or reckless disregard of the rights of an insured or a claimant' by the insurance company." *Phelps*, 736 F.3d at 703 (quoting *id.*).

If the threshold showing of punitive conduct is satisfied, a bad faith claimant must prove three elements:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer*, 864 S.W.2d at 890. At this stage, the inquiry is essentially whether a reasonable jury could find that the insurer "acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000) (citation omitted).[7] The Supreme Court of Kentucky has summarized the foregoing as follows:

---

[7]      In *Phelps*, the Sixth Circuit found the Kentucky Supreme Court's statement in *Farmland* "confusing because a claim will obviously meet *Farmland*'s lower standard of

> [T]o prevail on a third-party bad-faith claim under Kentucky's Unfair Claims
> Settlement Practices Act, a plaintiff must prove not only the insurer's
> unreasonable failure to respond to a legitimate claim to recover policy proceeds
> but also must produce evidence that the insurer acted recklessly indifferent to
> the plaintiff's right to recover.

*Hollaway*, 497 S.W.3d at 734.

Here, GEICO concedes that it was obligated to pay under Shvets' policy, but it argues that Wells cannot create a genuine dispute of material fact regarding the second and third elements, which largely concern whether it reasonably refused to settle for as long as it did. [Record No. 48-1, p. 16]  GEICO also contends that its actions did not manifest a "malevolent intent" toward Wells.  [*Id.* at p. 21]

### 1.    Wells has not shown that GEICO failed to act on knowledge that would entitle her to the settlement she sought.

Wells must demonstrate that GEICO lacked a reasonable basis in law or fact for refusing her settlement demands, and that it either knew or was recklessly indifferent to her entitlement to the damages sought.  *Wittmer*, 864 S.W.2d at 890.  GEICO contends that there a no facts from which a jury could conclude that it completely lacked a reasonable basis for continuing to investigate Wells' claim.  [Record No. 48-1, p. 16]

Wells responds that GEICO's own conclusion regarding the severity of her claims is represented by the $100,002.00 reserve it set on September 8, 2017, which it failed to offer until May 20, 2019.  [Record No. 52, p. 11; *see also* Record Nos. 48-6, ¶ 18; 52-2, p. 83.]  She attributes this (and other claims considered below) to GEICO's "disregard of the results of its

---

'unreasonableness' if it has first met *Wittmer*'s higher standard of 'reckless disregard.'"  736 F.3d at 705.  The former inquiry, it found, was likely "render[ed] superfluous" by the latter. *Id.*  But the Sixth Circuit ultimately applied *Wittmer*'s test, and Kentucky's highest court continues to do so.  *See id.*; *see also Mosley*, 2021 WL 2618196, at *6.

own investigation," from which a jury could allegedly find that GEICO lacked a reasonable basis for denying her demands.  [*Id.*]  Therefore, the Court must consider whether, at any stage during the parties' settlement process, GEICO unreasonably denied Wells' demand.

In the eleven months between the accident and Wells' first demand letter, GEICO was seemingly the only party interested in resolving her claim.  The initial posture of Wells' claim was as follows: she had been a secured passenger in a vehicle that suffered minor damage in a rear-end collision.  [*See* Record No. 48-2.]  She sought medical attention immediately after the accident, but she had not requested it at the scene.  [*Id.*; Record No. 48-5, pp. 4-5]  When she first spoke with GEICO, she reported symptoms related to whiplash, but downplayed her injuries as "normal."  [Record No. 48-5, pp. 4-5]  Nevertheless, GEICO offered her $800.00 within six days of the accident, and Wells rejected the offer two weeks later.  [Record No. 52-2, p. 100]  In fact, she informed GEICO that she was unwilling to accept a settlement until she was "back to normal."  [*Id.*]

GEICO heard from Wells (now represented by counsel) only one time over the next seven months.  [*See id.* at pp. 87-88.]; *see also Wilbers v. Geico Cas. Co.*, 338 F. Supp. 3d 644, 649 (E.D. Ky. 2018) (granting summary judgment where the defendant's repeated phone calls to the plaintiff went unanswered).  And even after GEICO received this singular update, Wells failed to provide her medical records for several more months.  GEICO was not required to unilaterally increase its offer during the period leading up to her first demand, throughout which Wells largely ignored GEICO's requests for additional information.  *See Corio v. Nat'l Specialty Ins. Co.*, No. 2017-CA-1870-MR, 2019 WL 2157579, at *5 (Ky. Ct. App. May 17, 2019) (delay in settlement was explained in part by the fact that the "conclusive medical

evidence necessary to establish the extent of liability lie[d] in the hands of the claimant, not the insurer").

When GEICO learned that Wells was experiencing neurological issues and intended to demand the policy limits on Shvets' claim, it put itself in a position to respond to such a demand. [Record No. 52-2, pp. 84-87] Her claim was transferred to a different examiner in a unit "where higher value claims are adjusted," and the reserve on her claim was increased to $100,002.00. [Record No. 52, p. 3] But again, Wells dragged her feet. Despite counsel's promise to follow up on reports of various types of treatment—chiropractic, physical therapy, and neurological—GEICO did not receive a summary of Wells' medical treatment until December 2017, almost eleven months after the accident. [*See* Record No. 52-2, p. 79.]

Additionally, the first demand letter did not leave GEICO without a reasonable basis to refuse Wells' demand for the full policy limits. Her medical history indicated successful treatment for the physical symptoms that were a result of the accident, and GEICO's offer would have fully compensated for her costs related to that treatment. [Record Nos. 48-7, pp. 6, 11; 48-6, ¶ 11] Further, Wells' neurological records led GEICO to conclude that, despite Wells' claims, "no doctor had actually diagnosed [her] with a mild [TBI]." [Record No. 48-6, ¶ 7] This is not an unreasonable reading of Sudhakar's notes, which are not a model of clarity. [*See* Record Nos. 48-8, 48-9.] At times, Sudhakar states "concern" for a "possible" TBI which required further study; elsewhere, the notes state that a neurological assessment would be performed "since there was [TBI]." [Record No. 48-8, p. 4] At the second visit, the same conflicting notation continued, including an indication that Wells had still not undergone an MRI to confirm the diagnosis. [Record No. 48-9, p. 1] Thus, GEICO could reasonably infer from Wells' medical records that her TBI diagnosis was not final. And where the extent of

- 30 -

damages is "legitimately disputed," an insurer does not act unreasonably by continuing to investigate the claim. *Holloway*, 497 S.W.3d at 736.

It is also not as if GEICO denied Wells' entitlement to *any* damages in response to the first demand letter. GEICO authorized $75,000.00 to settle the claim, and its claim adjuster offered $60,000.00. [Record No. 52-2, p. 76-77] Although the offer was less than the policy limits, it was in excess of what Wells' counsel believed the policy limits to be. [*Id.* at p. 76] Wells cannot contend that it was unreasonable for GEICO to make an offer higher than what she expected when she made the first demand.

Of course, Wells rejected the offer, and she now contends that it was unreasonable because GEICO had set a reserve on her claim for the full policy limits. [Record No. 52, p. 11] However, this "argument misapprehends the role reserves play in insurance regulation." *Messer v. Universal Underwriters Ins. Co.*, 598 S.W.3d 578, 589 (Ky. Ct. App. 2019). A reserve "does not identify the minimal amount the insurer's own adjuster had evaluated as being owed to the insured." *Id.* at 591 (quotation omitted). Rather, reserves are "merely estimates of the insurer's total exposure" on a claim, and they are required by statute. *Id.* at 589. When Wells indicated her intention to seek the policy limits, GEICO was required to set a reserve that reflected its potential exposure. It is no surprise that GEICO's estimate of its actual exposure differed from the hypothetical reserve. Similarly, it was not unreasonable for it to make an offer based on Wells' medical records rather than taking counsel's word alone.

Moreover, Wells has not identified anything about GEICO's settlement behavior during litigation that was unreasonable. GEICO's initial response to Wells' suit was to "work with [defense counsel] to secure the additional info[rmation] needed for evaluation and resolution" of her claim. [Record No. 52-2, p. 68] It tasked counsel with collecting Wells'

- 31 -

medical records in an attempt to clarify the extent of her injuries.  And throughout 2018, it relied on counsel for periodic insights into discovery, after which it would re-evaluate Wells' claim.  [*See* Record No. 52-2, p. 34.]

Over time, counsel's strategy shifted to highlighting gaps in Wells' records that failed to demonstrate a link between the accident and her injuries.  [*See* Record No. 52-2, p. 49.] GEICO was often advised to wait for various records to be produced before it decided whether to increase the offer.  [*See id.* at pp. 41, 45, 51.]  Wells does not claim that this litigation strategy itself was unreasonable, nor could she.  *Knotts*, 197 S.W.3d at 520 (An insurer is entitled to "zealously defend[] itself.").  Further, it was not unreasonable for GEICO to heed counsel's advice, rely on counsel's interpretation of Wells' medical records, and re-evaluate her claim with these considerations in mind.  [*See* Record No. 52-2, p. 34.]

Similarly, Wells' second demand for the policy limits was not unreasonably denied. Despite over eight months having passed since the first demand in December 2017, Wells' damages had only increased by roughly $10,000.00, and they were still well below GEICO's offer.  [*See* Record No. 52-4, p. 5.]  The only intervening circumstance was the neurocognitive diagnosis by Han, but GEICO had been advised by counsel that the report was "inadequate." [Record No. 52-2, p. 38]  And GEICO was planning to question Wells about the report at her upcoming deposition.  [*Id.* at p. 34]  Thus, while Han's report detailed concerning findings about Wells' ongoing treatment and recovery, it did not deprive GEICO of any reasonable basis to question whether her claim was worth the full policy limits.

To be sure, after GEICO received the neuropsychological report by Han, it continued to attempt to "discredit" the TBI diagnosis with its own experts.  [Record No. 52-2, p. 22]  If this conduct were undertaken by GEICO disconnected from the context of litigation, it could

give rise to an inference that its singular intention was to secure a more favorable settlement. However, the Supreme Court of Kentucky has cautioned courts that "allowing introduction of evidence of litigation conduct" by an insurer's counsel in an underlying suit "threatens to turn our adversarial system on its head." *Knotts*, 197 S.W.3d at 522. Not only does this threaten to chill an insurer's ability to defend itself and its insured in court, but it subverts the role of the Kentucky Rules of Civil Procedure and Rules of Professional Conduct by requiring a jury to second-guess conduct that was not found objectionable in the underlying suit. *Id.* at 520-22. To address these concerns, there is a general prohibition against introducing evidence of "litigation conduct" to prove bad faith. *Id.* at 523. On the other hand, an insurer's "settlement behavior," even after suit is filed, is neither automatically admissible nor inadmissible *per se* because it is not ordinarily challengeable in the litigation process. *Id.* Rather, "before admitting evidence of post-filing behavior, courts must be careful to weigh the probativeness of the proposed evidence against its potential for prejudice." *Id.*

GEICO's acquiescence in counsel's strategy to undermine Wells' diagnosis is the type of conduct that this Court must be cautious of reviewing for impropriety. Wells does not claim that counsel's conduct was questioned in the underlying litigation. Additionally, GEICO was not weighing its response to a pending demand letter when it sought an independent review of Wells' diagnosis in January 2019. In fact, Wells' next demand was the one GEICO ultimately met. Thus, the Court does not find that evidence of counsel's strategy to discredit Wells' TBI diagnosis prior to trial would be admissible to prove that GEICO refused to settle her claim in bad faith. *See Knotts*, 197 S.W.3d at 523.

Finally, when GEICO was faced with information that significantly supported Wells' claim, it responded by offering the policy limits and, ultimately, accepting her settlement

demand.   Wells claims that GEICO's haste to meet her $300,000.00 demand "with no new information being presented" constituted an admission that it was "caught doing something improper." [Record No. 52, pp. 1, 11]  But this assertion mischaracterizes the record.  When Wells made her final demand, GEICO had already committed to paying the policy limits. [Record No. 52-2, p. 14]  This decision was based on several new developments: GEICO's reviewing physician had been unable to rule out a TBI diagnosis; Wells' medical bills were approaching GEICO's original offer and climbing; and her physician was prepared to testify regarding the TBI diagnosis.  [Record Nos. 48-11; 52-2, pp. 14-15]  Thus, GEICO reasonably concluded that Wells' claim was worth more than it had originally offered.  But before it could transmit the policy-limits offer, GEICO was faced with Wells' demand for three times that amount.  To avoid a trial against its insured that seemed like a losing venture, it met Wells' demand.  [*See* Record No. 48-6, ¶ 18.]

\*       \*       \*

In summary, GEICO had ample reasonable bases for refusing Wells' policy-limits demand until it ultimately acquiesced.  At the very least, "no reasonable jury could survey all of the evidence and conclude that [GEICO] had no reasonable basis for believing that [Wells'] claim was worth less than [s]he demanded." *Raymer v. Zurich Am. Ins. Co.*, No. 08-cv-360-ART, 2010 WL 11651819, at \*6 (E.D. Ky. Nov. 22, 2010).  While the Court finds that this is sufficient to grant GEICO's motion for summary judgment, it also will consider whether Wells has demonstrated sufficiently flagrant conduct to warrant a finding of bad faith.

### 2.    Wells has failed to allege anything resembling outrageous conduct.

To succeed on her claim, Wells must provide "proof of bad faith sufficient for the jury to conclude that there was conduct that was outrageous, because of the defendant's evil motive,

or his reckless indifference to the rights of others." *Motorists Mut.*, 996 S.W.2d at 452. Generally, an insurer may not "force an insured to go needless adversarial hoops . . . or delay claims hoping that the insured will settle for less." *Farmland Mut.*, 36 S.W.3d at 376. The Sixth Circuit has identified several factors that may support a finding of bad faith: "lowball" offers that are "barely above" the claimant's actual damages; "extensive delay" in settling the claim or requesting the claimant's records; refusing to disclose the insured's policy limits; and "troubling claims-handling practices" such as "switching claims adjustors without explanation, . . . refusing to increase an offer without documentation of additional damages, failing to ask [a claimant] to submit to an [IME], and failing to include facts in the claim file that would support a jury verdict in [the claimant's] favor." *Phelps*, 736 F.3d at 705-07.

Here, few of these factors are present in the record, and none of them give rise to an inference of outrageous conduct. GEICO's initial offer was nearly double Wells' actual damages. [*See* Record No. 48-7, p. 11.] Wells made no argument that GEICO refused to disclose its policy limits or engaged in any of the other identified "troubling" practices. And it was Wells, not GEICO, that precluded an independent review of her symptoms.

Wells almost exclusively argues that GEICO "exhibited bad faith in the extensive delay before [her] claim could be settled." [Record No. 52, p. 11] However, "mere delay in settlement does not rise to bad-faith conduct." *Mosley*, 2021 WL 2618196, at *6 (citing *Zurich Ins. Co. v. Mitchell*, 712 S.W.2d 340, 341 (Ky. 1986)). Wells must come forward with "evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Motorists Mut.*, 996 S.W.2d at 452-53. Wells acknowledges this standard but provides no facts which could give rise to an inference that GEICO intended to extort or deceive her. She

merely notes that "other cases with even shorter delays" have found bad faith. [Record No. 52, p. 11 (citing *Phelps*, 736 F.3d at 705)] Of course, this is not surprising given the nature of the inquiry. But here, the facts do not give rise to such an inference.

As detailed previously, the time between the accident and the parties' settlement was often the product of GEICO's requests for additional information. There is no suggestion that GEICO did not promptly make these requests. *Cf. Phelps*, 736 F.3d at 706 (where an insurer waited six-and-a-half months to seek records it needed to confirm a claimant's prior medical history). Additionally, Wells did not even make a demand until eleven months after the accident, and she filed suit soon after. *See Powell v. Cherokee Ins. Co.*, 919 F. Supp. 2d 873, 881 (W.D. Ky. 2013) (finding no bad-faith delay where "it was [the claimant's] delay—not [the insurer's]—that stalled the processing of her claim"). And after Wells filed suit, it was not extortionate or outrageous for GEICO to defend itself. *See id.* at 881-82 (An insured's need to depose a claimant to mount a defense does not indicate that a claim was delayed in bad faith.). It is also worth mentioning that throughout the entirety of the parties' settlement negotiations, Wells did not once lower her demand. *See Mosley*, 2021 WL 2618196, at *7 ("She cannot now complain of the delay in settlement when she refused to budge from her settlement demand."); *see also* Wilbers, 338 F. Supp. 3d at 649 (finding no bad faith where a claimant "refused to negotiate beyond her policy-limits demand before filing suit").

In short, large chunks of the so-called delay can be explained by either Wells' own actions or routine delays caused by the parties' litigation. *See Powell*, 919 F. Supp. 2d at 881 (delay "due to scheduling conflicts" do not manifest a "scheme to deceive or delay"). If there exist periods of time during which GEICO had no legitimate reason for prolonging payment, neither the Court's review of the record nor Wells' submissions has identified them.

Wells' other efforts to demonstrate bad faith are unavailing. She contends that GEICO's "disregard of the results of its own investigation can be considered a delay tactic," and that it "used delay as leverage to attempt to settle for a much smaller amount, as its training guides dictate." [Record No. 52, p. 11] Both arguments are unavailing for reasons already stated. By "investigation," Wells appears to be referring to the fact that GEICO set a reserve on her claim and gave authority to pay an amount greater than what she was offered. But, as previously mentioned, the mere fact that a reserve was set is insufficient to prove that GEICO determined the true worth of Wells' claim. *See Messer*, 598 S.W.3d at 589. Similarly, the fact that GEICO extended up to $75,000.00 to resolve Wells' claim did not bind it to pay that amount. Nor is there any indication that Wells would have accepted an offer for the authorized amount, which was 25% than her demand.

Finally, the training materials do not give rise to an inference that GEICO's conduct was motivated by a reckless indifference to Wells' rights. GEICO has shown that the materials are no longer provided to its employees. [Record No. 55-1, pp. 88-89] And even if the employees that handled Wells' claims were provided these materials in the past, Wells has failed to demonstrate that any of the recommended tactics were employed in this case.

*       *       *

At first glance, the amount of time between Shvets' negligent act and Wells' settlement may seem prolonged. But considering the circumstances as the Court must, it is difficult to see how GEICO could have settled the claim more promptly. Taking into account the eleven months GEICO waited for Wells' first demand letter, and considering the fact that GEICO defended its insured in litigation for over a year thereafter, the 29-month period is considerably condensed. At no point during the settlement of Wells' claim did GEICO refuse a request

despite knowing Wells was entitled to the policy limits.  And even if GEICO had unreasonably refused her request, there is no indication that it delayed payment for an improper purpose. Thus, its motion for summary judgment is appropriate and will be granted.[8]

Accordingly, it is hereby

**ORDERED** as follows:

1.     The defendant's motions to exclude the plaintiff's expert and for summary judgment [Record Nos. 48, 49] are **GRANTED**.

2.     The jury trial in this matter, currently scheduled to begin September 13, 2021, is **CANCELED**, and all deadlines set out in the Amended Scheduling Order [Record No. 26] are **VACATED**.

Dated:  July 23, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

---

[8]     The Court does not find it necessary to address GEICO's alternative argument that Wells has failed to prove cognizable damage.  [*See* Record No. 48-1, pp. 23-24.]  But the Court does note that it has previously rejected such an argument, even where the plaintiff's evidence of emotional damages was thin.  *See Foster v. Am. Fire & Cas. Co.*, 219 F. Supp. 3d 590, 597 (E.D. Ky. 2016) (surveying Kentucky caselaw and denying summary judgment as to damages where the plaintiff's testimony alone constituted sufficient evidence of emotional distress).